1
2
3
4                    UNITED STATES DISTRICT COURT

5                   NORTHERN DISTRICT OF CALIFORNIA

6

7    UNITED STATES OF AMERICA,              Case No.  14-cr-00413-JSW-1

8                    Plaintiff,

9          v.                              **ORDER DENYING MOTION TO DISMISS**

10   JOSE SALAS,                           Re: Dkt. No. 54

11                   Defendant.

12

13          Now before the Court for consideration is the motion to dismiss filed by Defendant Jose

14   Salas ("Salas").  The Court has considered the parties' papers, relevant legal authority, and the

15   record in this case, and it finds the motion suitable for disposition without oral argument.  The

16   Court HEREBY DENIES Salas' motion.

17                                  **BACKGROUND**

18          On November 6, 2013, a confidential informant (the "CI") working with agents from the

19   Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), advised ATF Agent Justin Quinn

20   ("Agent Quinn") that he met Salas earlier that day and learned that "Salas was looking to sell two

21   firearms."  (Declaration of Angela Hansen ("Hansen Decl."), ¶ 2, Ex. A, ATF Report at Salas-9,

22   ¶ 1.)[1]  The CI reportedly advised ATF agents that Salas lived in a house on Murray Drive in

23   Hayward, California, that he had seen Salas driving a green ford Thunderbird, and that Salas had

24   provided him with his phone number, which the CI identified as 510-677-8139.  (*Id.*)  Agent

25   Quinn requested that the CI contact Salas to arrange the sale for the following day.  It is

26

27   [1]      Both parties have submitted reports prepared by the ATF.  For ease of reference, the Court
     will cite to the Bates numbers stamped on the bottom of those reports and paragraph numbers
28   when available.  The Court omits all preceding "0s" in the Bates numbers.

United States District Court
Northern District of California

1    undisputed that this phone call was not recorded.  (*Id.*)  In light of Salas' arguments in this motion,

2    the Court will refer to the person with whom the sale was arranged as the "seller."

3            On November 7, 2013, in the presence of Agent Quinn and ATF Agent Daniel Demas

4    ("Agent Demas"), the CI contacted the seller at 510-677-8139 to arrange to meet.  (*Id.* at Salas-10,

5    ¶ 4.)  During this conversation, the seller apparently stated that he "had become worried that he

6    would be selling the firearms to the CI who he had just met.  The CI assured him that both the CI

7    and the CI's cousin (SA Demas) were not working with law enforcement."  (*Id.*)  The seller also is

8    alleged to have told the CI that the firearms were in a green Ford Thunderbird" that was parked on

9    the street.  (*Id.* at Salas-10, ¶ 4, Salas-13, ¶ 1.)  According to the ATF reports, that call was "not

10   recorded but conducted in the presence of and monitored by" Agents Quinn and Demas.  (*Id.* at

11   Salas-10, ¶ 4, Salas-13, ¶ 1.)

12           Agent Demas and the CI then drove to Murray Drive.  Before they arrived, other ATF

13   agents conducted surveillance of the Murray Avenue residence and stated that they observed Salas

14   leave the home and move a green Ford Thunderbird to the street.  (*Id.* at Salas-10, ¶ 3.)  About ten

15   minutes later, they observed Salas exit the house again, retrieve a black bag from the Ford

16   Thunderbird, take the bag inside the home, and return it to the Ford Thunderbird.  (ATF Report at

17   Salas-10, ¶¶ 5, 7-8.)  The Agents also observed another individual enter and exit the home on

18   Murray Drive.[2]  (*Id.* ¶ 6.; *see also id.* Salas-13, ¶ 2; *see also* Declaration of Sarah Mauricio, ¶¶ 3-

19   6.)  These surveillance activities were not recorded.

20           Agent Demas did record portions of the drive to and from Salas' residence.  As Agent

21   Demas and the CI were driving, the CI received a telephone call from the seller and responded

22   "Hey, I'm on my way to grab them right now. … I ain't made it to there yet. …. Okay, alright, I'll

23   be there in a minute."  (Docket No. 62, Recording 2.001_UC at 3:34-3:52; Hansen Decl., ¶ 2, Ex.

24   A, ATF Report at Salas-13, ¶ 1.)  Based on the video recording taken from the CI's perspective,

25   the CI is texting during the drive.  (*See generally* Docket No. 63, Recording 1.002_CI.)  Salas

26

27   [2]      According to the ATF reports, agents "later" discovered that the Ford Thunderbird was
     registered to someone other than Salas.  (Salas-9-10, ¶ 3.)  However, Salas has introduced
28   evidence that suggests he purchased the vehicle from that person on or about September 22, 2013.
     (Hansen Decl., ¶ 3, Ex. F.)

United States District Court
Northern District of California

argues that the CI may have been texting with the seller, because at one point the CI advised ATF Agent Demas that "He's like trippin' … I'm like don't worry dude, it's cool." (Recording 1.002_CI at 2:47-2:56.)

When Agent Demas and the CI arrived at Murray Drive, Agent Demas asked the CI if he could see the seller, and the CI responded, "He says he ain't coming out." (Recording 2.001_UC at 6:43-6:51.) Agent Demas and the CI then approached the green Thunderbird, the CI removed a black nylon bag from the back seat, left money under the driver's side floorboard, and returned to their vehicle. (*See generally* Recording 1.002_CI and Recording 2.001_UC.) When they opened the bag, Agent Demas observed a .410 caliber shotgun and a Ruger .22 caliber rifle. (Salas-11, ¶ 14, Salas-13, ¶ 3.)

After the transaction was complete, ATF Agent Demas told the CI contact the seller by phone, to put the call on speaker, and "tell him you left it on the floor board." (Recording 2.001_UC at 9:29-9:47; Salas-14, ¶ 4.) The CI responded that the seller "like turned his s*** off," and then stated "I'm gonna shoot him a text." (Recording 2.001_UC at 10:15-10:20.) According to the ATF reports, after Agent Demas and the CI left Murray Drive, Salas exited the home on Murray Drive, moved the Ford Thunderbird, appeared to look in and under the trunk of the car, and then went back into the home. (Hansen Decl., Ex. A, ATF Report at Salas-11, ¶ 12.)

On July 23, 2014, Salas was arrested and subsequently charged with felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). (*See* Docket No. 1 (Criminal Complaint); Docket No. 7 (Indictment).) Salas was interviewed by Agent Quinn and ATF Agent Russell Withrow ("Agent Withrow") following his arrest. (Hansen Decl., ¶ 4, Ex. G.)

On September 15, 2014, Salas' counsel requested, via email, that the Government produce the content of text messages between the CI and the alleged Seller. (Hansen Decl. ¶ 6.) On October 9, 2014, Salas' counsel reiterated the request, again via email, that Government produce this information and cited to the video recordings to show that the CI had sent text messages and spoke to the seller on the drive to the transaction. (*Id.*) Salas did not receive a response from the Government to either of these requests.

On November 24, 2014, Salas' counsel sent a letter to the Government and requested, any

United States District Court
Northern District of California

1    and all documentation regarding recorded or unrecorded phone calls between the CI and the phone

2    number that the CI stated belonged to Salas, including but not limited to, audio files, notes, and

3    phone records.   (Hansen Decl., ¶ 7.)  Counsel also requested phone records, text and voice

4    message content, screen captures, and reports documenting the content of texts or recordings of

5    messages that were sent and received between the CI and the number that the CI stated belonged

6    to Salas.  (*Id.*)  On November 28, 2014, the Government advised Salas' counsel that it had no

7    record of calls or text messages, and it advised Salas' counsel that it had subpoenaed phone

8    records and was willing to produce the seller's phone records and any relevant portions of the CI's

9    phone records.  (*Id.* ¶ 8.)

10        On January 14, 2015, Salas' counsel asked the Government to preserve the CI's phone.

11   Government counsel responded, "I don't know if I can preserve the phone at this point because it

12   has been months, and the phone may have changed since.  This is why we are getting the phone

13   records, to determine if there was any contact.  Right now, despite any statement … to connect via

14   text, we have no information the informant actually followed up and actually connected with the

15   defendant with text."  (*Id.*¶ 9.)[3]  According to ATF Agent Justin Quinn, the phone the CI used to

16   contact the seller is not in ATF custody.  (Quinn Declaration, ¶ 3.)

17        On February 24, 2015, the Government produced redacted call detail records from the CI's

18   phone from November 6, 2013 through November 17, 2013, and subscriber records and call detail

19   records for 510-677-8139 from October 27, 2013 through November 17, 2013.  (Declaration of

20   Madeline Larsen ("Larsen Decl."), ¶¶ 2-3.)  According to a chart prepared by Salas, the phone

21   records demonstrate 54 contacts between the CI and the number he claimed belonged to Salas,

22   which consisted of 51 minutes of phone calls, and 29 text messages.  (Larsen Decl. ¶¶ 4-7, Exs. H-

23   J.)  It is undisputed that the Government has not produced the content of any text messages

24   between the CI and the alleged seller.

25        The Court shall address additional facts as necessary in the remainder of this Order.

26   //

27   _____

28   [3]    The Government has not disputed Salas' representations regarding the discovery requests
     or its responses thereto.

United States District Court
Northern District of California

**ANALYSIS**

**A.      Applicable Legal Standard.**

Salas moves to dismiss on the basis that the Government violated his due process right to present a complete defense.  *See California v. Trombetta*, 467 U.S. 479, 485 (1984).  A defendant may establish violation of the right to present a complete defense in when, for example, the government "suppresses or fails to disclose material exculpatory evidence[.]"  *Illinois v. Fisher*, 540 U.S. 544, 547 (2004); *accord United States v. Del-Toro Barboza*, 673 F.3d 1136, 1149 (9th Cir. 2012).  In such a case, "the good or bad faith of the prosecution is irrelevant[.]"  *Fisher*, 540 U.S. at 547.  In the alternative, a defendant may establish that his right to present a complete defense has been violated where the government fails "'to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant.'"  *Id.*  (quoting *Arizona v. Youngblood*, 488 U.S. 51, 57 (1988)).  Salas contends that his case falls within the alternative framework, *i.e* that the Government failed to preserve "potentially useful" evidence.

In order to show that dismissal is warranted under this theory, Salas must satisfy a two-prong test.  *See, e.g, United States v. Sivilla*, 714 F.3d 1168, 1172 (9th Cir. 2013) (citing *Trombetta*, 467 U.S. at 489).[4]  First, he must show that the Government acted in bad faith.  Second, he must show that he is unable to "obtain comparable evidence by other reasonably available means."  *Sivilla*, 714 F.3d at 1172.

**B.      The Court Denies Salas' Motion.**

Salas argues that the Government's failure to preserve any record of the content of communications between the CI and the alleged seller prevents him from presenting a complete defense and, in particular, a defense of entrapment.  If Salas is unable to show the Government acted in bad faith, the Court would not need to reach the second prong of the *Sivilla* test.  However, the Government has not put forth any viable response to Salas' argument that, given the passage of time, he is unable to obtain the content of any text messages that may have been

---

[4]      For ease of reference, the Court will refer to this test as the "*Sivilla* test."

1    exchanged between the CI and the alleged seller.[5]

2         Thus, resolution of this motion hinges on whether Salas has met his burden to show the

3    Government acted in bad faith.  In *Youngblood*, the Supreme Court explained the term "bad faith"

4    to mean "those cases in which the police themselves by their conduct indicate that the evidence

5    could form a basis for exonerating the defendant."  488 U.S. at 58.  "[T]he presence or absence of"

6    bad faith "'turns on the government's knowledge of the apparent exculpatory value of the

7    evidence at the time it was lost or destroyed.'"  *Sivilla*, 714 F.3d at 1172 (quoting *United States v.*

8    *Cooper*, 983 F.3d 928, 931 (9th Cir. 1993)); *accord United States v. Zaragoza-Moreira*, 780 F.3d

9    971, 977 (9th Cir. 2015).

10        In *Sivilla*, the defendant was arrested and charged after he crossed the border and law

11   enforcement agents discovered drugs hidden inside the engine of his car.  After his arrest, the

12   defendant requested that the government preserve evidence seized from his car and filed a motion

13   to preserve and inspect evidence.  The district court also ordered the government to preserve the

14   defendant's car, which was subject to forfeiture proceedings.  714 F.3d at 1170.  Although the

15   agent assigned to the case directed the forfeiture provision to preserve all evidence, the car was

16   sold at auction and stripped for parts.  *Id.* at 1171.

17        At trial, the government contended that it would have been difficult to remove the drugs

18   from the engine.  The defendant's theory was that a few days before his arrest, he loaned the car to

19   his sister-in-law's boyfriend and was a "blind mule."  He further argued that he could have

20   supported this theory, if he had been able to inspect the car's engine, by showing the drugs could

21   have been removed easily by third parties.  714 F.3d at 1170-71.  The defendant moved to dismiss

22   the indictment and, in the alternative, requested a jury instruction regarding the government's

23   failure to preserve the car.  The district court denied both requests.  *Id.*  The Ninth Circuit affirmed

24   the district court's decision to deny the motion to dismiss.  It reasoned that photographs had been

25   taken of the car and that it would not have been apparent that the car itself had any exculpatory

26

27   _____

[5]        The Government initially suggested that Salas might have access to comparable evidence.
28   That argument was based on the faulty premise that a cell phone seized from Salas on the date of
     his arrest was the same phone used to initiate the transaction.

*(left margin, vertical text)* United States District Court / Northern District of California

1  value at the time it was destroyed.  Thus, although it found that the government "was negligent in

2  not preserving the evidence," the defendant had not shown bad faith.  *Id.*

3          The *Zaragoza-Moreira* case also involved a defendant who was arrested and subsequently

4  charged with drug offenses when she was found in possession of drugs at the border.  After she

5  had been directed to a secondary inspection, the defendant, in response to questioning, "blurted

6  out" that she had packages on her.  During a post-arrest interview, the defendant informed law

7  enforcement agents that she had tried to make her presence in line "obvious" and advised them

8  that she was pressured to carry the drugs into the United States.  780 F.3d at 975-76.

9          As part of a discovery request, defense counsel asked the government to preserve any and

10  all videotapes which related to the defendants arrest.  The court also ordered the government to

11  preserve video footage from the date of the defendant's arrest.  However, the video was recorded

12  within a month after the defendant's arrest.  *Id.* at 976-77.  The defendant moved to dismiss the

13  indictment, and although the district court found that the evidence was "potentially useful," to a

14  defense of duress, it determined the government had not acted in bad faith.  *Id.* at 978.

15          The Ninth Circuit reversed.  It reasoned that the defendant's had repeatedly advised the

16  agents about her behavior while waiting to cross the border.  The defendant also told the agents

17  that she did not want to "do it" and had been removed from the line by the people with whom she

18  was travelling after she tried to loosen the packages of drugs taped to her body.  The court found

19  that those statements demonstrated the defendant "repeatedly alerted [the agent] to her duress

20  claim." *Id.* at 979.  The court also found that the agent's questions to the defendant demonstrated

21  that the agent "appreciated the significance" of the defendant's claims.  *Id.*

22          The agent also testified that she understood her professional obligation to collect and

23  preserve evidence, was aware that duress was a defense to a crime, and knew that the area was

24  under surveillance.  The Ninth Circuit found that those facts, combined with the fact that she failed

25  to include any of the defendant's statements regarding coercion in her reports or in her affidavit to

26  support the criminal complaint, demonstrated that she had acted in bad faith rather than

27  negligently.  *Id.* at 980.

28          Salas argues that, as in the *Zaragoza-Moreira* case, the facts here support a finding of bad

United States District Court
Northern District of California

United States District Court
Northern District of California

faith.  It is undisputed that the ATF Agents directed the CI to contact the alleged seller by phone, and the video recordings do support Salas' argument that Agent Demas was aware that the CI had texted the seller during the drive to retrieve the firearms.  Salas argues that text messages or phone recordings could have been used to attack the CI's version of events.  The Government does not dispute the general proposition that it would have an obligation to disclose impeachment evidence relating to the CI.  *See, e.g., United States v. Bernal-Obseo*, 989 F.2d 331, 335 (9th Cir. 1993). With respect to the CI's discussions with the seller during the drive, those discussions were consistent with the expectations that the seller was waiting for the CI to arrive to pick up and pay for the firearms.  In addition, the ATF reports that Salas was observed at that residence and taking a black bag to and from the Ford Thunderbird, which he is alleged to have owned on that date. These observations were consistent with information provided to the ATF by the CI.  There is nothing in those conversations that to suggest they would contain potentially exculpatory evidence.

Salas states, and the Government does not dispute, that the phone records show that, between November 6, 2013 and November 7, 2013 at 3:42 p.m., the CI sent twelve text messages to the seller, whereas the seller sent only one text message to the informant.  The Court must focus on the government's "knowledge of the apparent exculpatory value of the evidence at the time it was lost or destroyed."  *Sivilla*, 714 F.3d at 1172 .  There is nothing in the record, however, to show that the ATF Agents were aware of the alleged frequency with which the CI contacted the seller.[6]

Salas also argues that bad faith can be inferred because the video recordings show Agent Demas turning off recording devices.  (*See generally* Recording 1.002_CI and Recording 2.001_UC.)  In the first instance, the CI removed a recorder from his person, because it was

---

[6]     The delay between the incident that gave rise to Salas' arrest and his actual arrest provides support forth both parties.  On the one hand, if the investigation was on-going, that favors Salas' argument that evidence should have been preserved.  On the other hand, until he was arrested, Salas did not have the opportunity to alert the Government that he had any interest in the text messages or contents of phone conversations. *Cf. United States v. Vera*, 231 F. Supp. 2d 997, 1000 (D. Ore. 1997) (noting that the defendant had not been indicted at the time the evidence at issue was destroyed and, therefore "could not have put the government on notice of his interest in the samples or of any theory he might have had about their potential exculpatory value").

1    beeping.  Agent Demas asked him to put it in the glove compartment so it would not be seen.

2    Both the CI and Agent Demas were wearing recording devices at that time.  Thus, if the seller had

3    appeared, the contact would have been documented and the other recorder would have been

4    superfluous.  As to the second situation, although it is not clear what the CI is talking about, the

5    recording suggests that Agent Demas has turned off his recording device, because the transaction

6    had concluded.

7         Salas also argues that the statements he made during his post arrest interview should have

8    alerted the agents to his entrapment defense.  In order to establish an entrapment defense, Salas

9    would be required to "point to undisputed evidence making it patently clear that an otherwise

10   innocent person was induced to commit the illegal act by trickery, persuasion, or fraud of a

11   government agent."  *United States v. Smith*, 802 F.2d 1119, 1124 (9th Cir. 1986).  If a defendant is

12   predisposed to commit the crime, the entrapment defense fails.  *Id.*  In the Ninth Circuit, courts

13   examine the following five factors to determine predisposition:

14        (1) the character or reputation of the defendant, including any prior
15        criminal record; (2) whether the government initially made the
          suggestion of criminal activity;(3) whether the defendant engaged in
16        the criminal activity for profit;(4) whether the defendant evidenced
          reluctance to commit the offense that was overcome by repeated
17        government inducement or persuasion; and (5) the nature of the
          inducement or persuasion supplied by the government.

18   *Id.* (citation omitted).  Of these five factors, the defendant's reluctance to commit the offense is the

19   "most important."  *Id.*

20        During his post-arrest interview, after Agent Withrow advised him that they wanted to

21   question him about the sale in November 2013, Salas stated "I remember, but the heck, why

22   should I be in trouble? … Why should I be in trouble?  I was scared to do it.  I'm thinking he's

23   going to shoot me, or something. … I wouldn't – I didn't sell it 'em to him.  What the f***; he's a

24   police officer – he had 'em with him.  I'm just in the world."  (Hansen Decl., Ex. G (Transcript of

25   Interview "Tr.") at 7:13-8:23; *see also id.* at 9:10-20 (denying that he sold the firearms and

26   asserting that "he had them guns with him".)  Salas continued that "I never had no – sold not guns

27   out of my car sir. … I did not sell them.  I returned them to the mother-motherf***er, this is your

28   guns." (*Id.* at 10:2-3, 9-11.)  Salas argues that these statements clearly refer to the CI.  Having

9

1  reviewed the transcript in the entirety, the Court is not persuaded and finds them ambiguous.  For

2  example, Salas also stated that, "that dude's walking with them in the streets," and that "[w]e were

3  all scared that he was like a gang member," but when asked to whom he was referring Salas

4  responded "I don't know what dude."  (*Id.* at 10:22-11:5.)

5       Looking at the transcript of Salas interview as a whole, the Court does not find Salas'

6  statements to be analogous to the statements made by the defendant in *Zaragoza-Moreira* case.

7  The defendant's statement that she did not want to "do it," in combination with her statements

8  about the persons who she claimed threatened her, implicated a coercion defense with clarity.

9  Although Salas clearly denied selling the firearms, the remainder of his statements about the

10  firearms, and who may have owned them, are ambiguous and would not have clearly alerted the

11  ATF Agents to a potential entrapment defense.

12       Salas also points to the fact that, in contrast to this case, ATF agents preserved and

13  produced such communications in another prosecution, *United States v. Dias*, No. 15-CR-314-

14  YGR, which arose out of the same investigation that gave rise to this case.  (Supplemental

15  Declaration of Madeline Larsen, ¶¶ 10-11.)  The Court is troubled by the fact that such

16  communications were preserved in the *Dias* investigation and were not preserved here.  However,

17  it appears to the Court that the Government acted negligently.  Its actions do not rise to the level of

18  bad faith that would warrant dismissal.

19                           **CONCLUSION**

20       For the foregoing reasons, the Court DENIES Salas' motion to dismiss.  This ruling is

21  without prejudice to Salas seeking an instruction regarding lost or missing evidence at trial.  *See,*

22  *e.g.,* Ninth Circuit Model Jury Instruction 4.18, Comment; *Sivilla*, 714 F.3d at 1173.

23       **IT IS SO ORDERED.**

24  Dated: June 24, 2016

25  _____

26  JEFFREY S. WHITE
    United States District Judge

27

28